UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | | |
|---|---|---|
| ALASKA ELECTRICAL PENSION FUND, Derivatively on Behalf of EPIQ SYSTEMS, INC., | ) ) ) | Civil Action No.   08-CV-2344 CM/JPO |

ALASKA ELECTRICAL PENSION FUND,
Derivatively on Behalf of EPIQ SYSTEMS,
INC.,                                          )

                    Plaintiff,     )

    vs.                                        )

TOM W. OLOFSON, CHRISTOPHER E.
OLOFSON, W. BRYAN SATTERLEE,
EDWARD M. CONNOLLY, JR., JAMES A.
BYRNES, JOEL PELOFSKY, ROBERT C.
LEVY, JANICE E. KATTERHENRY and
ELIZABETH M. BRAHAM,                           )

                Defendants,    )

   – and –                                   )

EPIQ SYSTEMS, INC., a Missouri
corporation,                                   )

        Nominal Defendant.     )

Civil Action No.   08-CV-2344 CM/JPO

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934,
BREACH OF FIDUCIARY DUTIES, ABUSE
OF CONTROL, GROSS
MISMANAGEMENT, CONSTRUCTIVE
FRAUD, CORPORATE WASTE AND
UNJUST ENRICHMENT

<u>DEMAND FOR JURY TRIAL</u>

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 5

PARTIES ......................................................................................................................... 6

DEFENDANTS' DUTIES ............................................................................................. 20

AIDING AND ABETTING AND CONCERTED ACTION ......................................... 24

BACKDATING ALLEGATIONS ................................................................................ 25

    Epiq's Stock Option Plans Authorized by the Shareholders ................................. 25

    Option Grants Backdated to July 10, 1997 ........................................................... 35

    Option Grants Backdated to December 1, 1997 ..................................................... 36

    Option Grants Backdated to September 1, 1998 .................................................... 37

    Option Grants Backdated to October 8, 1998 ....................................................... 38

    Option Grants Backdated to November 4, 1999 .................................................... 39

    Option Grants Backdated to December 10, 1999 ................................................... 40

    Option Grants Backdated to July 3, 2000 ............................................................. 41

    Option Grants Backdated to January 2, 2001 ........................................................ 42

    Option Grants Backdated to January 9, 2001 ........................................................ 43

    Option Grants Backdated to July 25, 2001 ........................................................... 44

    Option Grants Backdated to January 14, 2002 ...................................................... 45

    Option Grants Backdated to June 13, 2002 ........................................................... 46

    Option Grants Backdated to August 5, 2002 ......................................................... 47

    Option Grants Backdated to December 13, 2002 ................................................... 48

    Option Grants Backdated to December 9, 2003 ..................................................... 49

    Bullet Dodge Option Grants Backdated to February 14, 2005 .............................. 50

    Option Grants Backdated to January 3, 2006 ........................................................ 53

EPIQ'S FALSE AND MISLEADING PROXY STATEMENTS ................................................ 55

    Proxy Statement Filed in Connection with the 1998 Annual Meeting ............................ 58

    Proxy Statement Filed in Connection with the 2000 Annual Meeting ............................ 60

    Proxy Statement Filed in Connection with the 2001 Annual Meeting ............................ 62

    Proxy Statement Filed in Connection with the 2002 Annual Meeting ............................ 64

    Proxy Statement Filed in Connection with the 2003 Annual Meeting ............................ 66

    Proxy Statement Filed in Connection with the 2004 Annual Meeting ............................ 68

    Proxy Statement Filed in Connection with the 2005 Annual Meeting ............................ 70

    Proxy Statement Filed in Connection with the 2006 Annual Meeting ............................ 72

    Proxy Statement Filed in Connection with the 2007 Annual Meeting ............................ 75

    Proxy Statement Filed in Connection with the 2008 Annual Meeting ............................ 77

    False and Misleading Forms 3, 4 and 5 .......................................................................... 79

BACKDATING EPIQ'S STOCK OPTIONS FALSIFIED THE COMPANY'S
FINANCIAL STATEMENTS ........................................................................................ 79

    Audit Committee Members Who Engaged in Backdating Options Turned a Blind
        Eye to Internal Control Failures and Inadequate Disclosures ............................... 81

    False Financial Statements ............................................................................................. 83

    The Fiscal 1997 Report on Form 10-KSB ..................................................................... 86

    The Fiscal 1998 Report on Form 10-KSB ..................................................................... 86

    The Fiscal 1999 Report on Form 10-KSB40 ................................................................. 87

    The Fiscal 2000 Report on Form 10-K405 .................................................................... 87

    The Fiscal 2001 Report on Form 10-K405 .................................................................... 88

    The Fiscal 2002 Report on Form 10-K ......................................................................... 89

    The Fiscal 2003 Report on Form 10-K ......................................................................... 89

    The Fiscal 2004 Report on Form 10-K ......................................................................... 90

    The Fiscal 2005 Report on Form 10-K ......................................................................... 91

    The Fiscal 2006 Report on Form 10-K ......................................................................... 92

The Fiscal 2007 Report on Form 10-K ............................................................... 93

False and Misleading Sarbanes-Oxley Certifications ...................................... 95

False and Misleading Reports on Form 10-Q .................................................. 96

INSIDER TRADING ............................................................................................... 97

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS................................ 104

CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS ........ 109

JURY DEMAND ..................................................................................................... 121

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Epiq Systems, Inc. ("Epiq" or the "Company"), on behalf of the Company against its Board of Directors (or, the "Board") and certain of its senior executives (collectively, "defendants").   Epiq is a Missouri corporation that provides integrated technology solutions for the legal profession.  The Company's technology facilitates electronic discovery, document review, legal notifications and claims administration, among other tasks.  Tom W. Olofson led a private investor group that acquired Epiq in 1988 and he has served as CEO and Chairman of the Board of Epiq since that time.  In February 1997, the Company completed its initial public offering and thereafter Tom Olofson and his son, Christopher E. Olofson, President, COO and director, conferred upon themselves and top officers of the Company millions of stock options, a great deal of which were backdated.  These two defendants and others falsified SEC filings to keep the backdated options from coming to light.

2.      Plaintiff's investigation has revealed that Epiq has secretly backdated millions of options to its top officers and directors for nearly a decade, reporting false financial statements and issuing false proxies to shareholders.  Backdating stock options is now recognized as a deceptive practice companies throughout the securities markets have used to conceal grants of "in-the-money" options or options more "in-the-money" than disclosed, without reporting the corresponding requisite compensation expense.  Backdating stock options illicitly confers upon option recipients options far greater in value than that represented by the option date and price.  For example, if a company grants options on May 22, when its stock price is $20, but records the option date as April 22 when the stock price was only $10, and prices the option as fair market value on the purported date of grant, *i.e.*, $10, then the recipients of the option garner a hidden riskless profit, compensation expense is understated by $10 for each option, and the company receives $10 less that it should have upon the option's exercise.  Similarly, if a company grants options on May 22, when

- 1 -

its stock price is $20, but records the option date as April 22 when the stock price was only $10, and

prices the option at a fixed percentage of fair market value on the purported date of grant, *e.g.*, 85%

or 110%, for prices of $8.50 and $11, respectively, then the recipients of the option garner a hidden

riskless profit, compensation expense is understated by $11.50 and $9 for each option, and the

company receives $11.50 and $9, respectively, less than it should have upon the option's exercise.

      3.      Lynn Turner, the SEC's former Chief Accountant, described undisclosed backdating

as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the

finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is

ripping off shareholders in an unconscionable way" and "represents the ultimate in greed." By now,

defendants' backdating scheme has yielded stock option grants to the Company's executive officers

worth millions of dollars. These grants were included in more than $35 million in stock sale

proceeds for defendants and other Company insiders.

      4.      Statistical analysis and extensive review of the Company's SEC filings reveals that

Epiq's stock option grants to officers and directors were priced at (or based on a fixed percentage of)

the lowest closing price or intraday trade for the month, quarter and/or year with highly improbable

frequency. Indeed, the odds that Epiq priced certain of its options by chance (rather than

manipulation) are well over 1 in 1,000,000. *See infra* ¶¶70-73. This action seeks to remedy

defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of

control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising

out of a scheme and wrongful course of business whereby defendants allowed Epiq insiders to divert

tens of millions of dollars of corporate assets to themselves via the manipulation of grant dates

associated with hundreds of thousands of stock options granted to Epiq insiders. Each of the

defendants also participated in the concealment of the backdating option scheme complained of

herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge illicitly obtained compensation and proceeds diverted to them since 1997.

5.      Between 1997 and the present, defendants also caused Epiq to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including proxy statements filed with the SEC which stated that the options granted by Epiq carried with them an exercise price equal to or based on a fixed percentage of the fair market value of Epiq stock (the closing price) *on the date of grant*.

6.      Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 ("Exchange Act"), as well as Kansas and Missouri law.  By authorizing and/or acquiescing in the stock option backdating scheme, defendants: (i) caused Epiq to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Epiq executives; and (iii) subjected Epiq to potential liability from regulators, including the SEC and the Internal Revenue Service ("IRS").  As stated by Harvey Pitt, former Chairman of the SEC, "backdating" plainly violates both the federal securities laws and state corporate fiduciary laws:

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders.
>
> *      *      *
>
> Securities law violations are not the only potential problems with backdating options grants.  Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments.  On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.
>
> *      *      *
>
> More fundamentally, the financial statements of a company that has engaged in backdating may require restatement.  The options may not be deductible, and the

expenses, as well as the various periods to which they may have been allocated, may also be incorrect. . . .

More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?

Those who backdate options grants violate federal and state law.  And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct.  If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Harvey Pitt, *The Next Big Scandal*, Forbes.com.

7.      Defendants' gross mismanagement and malfeasance over the past decade has exposed Epiq and its senior executives to criminal and civil liability for issuing false and misleading financial statements.   Specifically, defendants caused or allowed Epiq to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Epiq's earnings and earnings per share.

8.      Defendants' malfeasance and mismanagement during the relevant period has wreaked tens of millions of dollars of damages on Epiq.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations as to void all grants made pursuant to the plans.  Meanwhile, certain of the defendants and other insiders, who received undisclosed in-the-money stock and/or knew material non-public information regarding Epiq internal control problems, abused their fiduciary relationship with the Company by selling over $35 million worth of their personally held shares at artificially

inflated prices during the relevant period. This action seeks recovery for Epiq against defendants, as Epiq's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§10(b) and 14(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78n(a), and under Missouri law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. This complaint also asserts violations of Kansas law. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

10.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in that plaintiff and the defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. Each of the trustees of Alaska Electrical Pension Fund is a citizen of the state of Alaska and none of the defendants is a citizen of the state of Alaska. Moreover, this Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

11.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Epiq is located in and conducts its business in this District. Further, defendants conduct business in this District, and certain of the defendants are citizens of Kansas and reside in this District.

**PARTIES**

13.     Plaintiff Alaska Electrical Pension Fund ("Alaska Pension Fund") is a shareholder of nominal party Epiq, holds 47,550 shares and has held Epiq stock since July 31, 2001.  Each of the trustees of Alaska Pension Fund is a citizen of the State of Alaska.

14.     Nominal defendant Epiq is a Missouri corporation with its principal business address located at 501 Kansas Avenue, Kansas City, Kansas 66105.

15.     Defendant Tom W. Olofson ("T. Olofson") has been CEO and Chairman of the Board of Directors of Epiq since 1988.  Defendant Christopher E. Olofson is T. Olofson's son.  Until March 2004, T. Olofson acted as a member of the Company's Stock Option Committee and granted backdated options to employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans.  T. Olofson was a member of the Company's Audit Committee from February 7, 1997 to April 11, 2001.  T. Olofson knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through his granting of hundreds of thousands of backdated options, and his son's receipt of hundreds of thousands of backdated options, T. Olofson knew that he and other Epiq directors and officers were backdating stock option grants.

16.     T. Olofson participated in (and did work in connection with) four meetings of the Board of Directors in each of 1997-2000, and ten meetings, seven meetings and eight meetings of the Board of Directors in 2001-2003, respectively, and at least one meeting in 2004, during which he engaged in backdating options on Epiq's Stock Option Committee.  T. Olofson did work in connection with and participated in three meetings with the Company's external auditors from

- 6 -

February 7, 1997 to April 11, 2001, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

17.     Although he disregarded that he and other of Epiq's directors and officers were backdating stock option grants, T. Olofson participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-Q, Reports on Form 10-K and proxy statements, and Forms 4 and 5. As pleaded herein, T. Olofson engaged in *ultra vires* acts. T. Olofson also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws. He sold over 2 million shares of Epiq stock for proceeds of approximately $18.5 million during the relevant period based on his knowledge of material non-public information regarding the Company.

18.     The backdated stock options T. Olofson granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders. As of May 7, 1997, T. Olofson owned 47.6% of Epiq's outstanding stock and although his percentage ownership declined thereafter, his share ownership increased.   T. Olofson generally has been the largest single shareholder of Epiq since the Company went public. As of January 4, 2008, T. Olofson beneficially owned approximately 13.6% of Epiq's outstanding stock. T. Olofson has exercised control of the Company through his share ownership and his deceptive conduct pleaded herein, to accomplish and perpetuate his self dealing and the self dealing of other defendants in backdated stock options. T. Olofson is a citizen of the State of Missouri.

19.     Defendant Christopher E. Olofson ("C. Olofson") has been President of Epiq since 1998 and Chief Operating Officer ("COO") of Epiq since 1996 and a member of the Board of Directors since 1995.  Until March 2004, C. Olofson acted as a member of the Company's Stock Option Committee and granted backdated options to employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans.  Defendant T. Olofson is defendant C. Olofson's father.  C. Olofson knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  C. Olofson participated in (and did work in connection with) four meetings of the Board of Directors in each of 1997-2000, and ten meetings, seven meetings and eight meetings of the Board of Directors in 2001-2003, respectively, and at least one meeting in 2004, during which he engaged in backdating options on Epiq's Stock Option Committee.

20.     C. Olofson has received the largest amount of stock options granted to any single employee of the Company since Epiq went public.  During this period, he received between 9.3% and 33.3% of all stock options granted to Epiq employees in each fiscal year, a substantial portion of which were backdated.

**Options Granted Christopher Olofson as a Percentage of All Options Granted
All Employees per Fiscal Year**

| Fiscal Year | % Of All Options Granted All Employees |
|---|---|
| 1997 | 33.3% |
| 1998 | 32.1% |
| 1999 | 30.2% |
| 2000 | 17.3% |
| 2001 | 32.1% |
| 2002 | 29.9% |

- 8 -

| Fiscal Year | % Of All Options Granted All Employees |
|---|---|
| 2003 | 27.5% |
| 2004 | 9.3% |
| 2005 | 17.4% |

21.     Through his granting and receipt of hundreds of thousands of backdated options, C. Olofson knew that he and other Epiq directors and officers were backdating stock option grants. Although he disregarded that he and other of Epiq's directors and officers were backdating stock option grants, C. Olofson participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-Q, Reports on Form 10-K and proxy statements, and Forms 4 and 5.  As pleaded herein, C. Olofson engaged in *ultra vires* acts.  C. Olofson also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws.  He sold nearly 900,000 shares of Epiq stock for proceeds of approximately $10.5 million during the relevant period based on his knowledge of material non-public information regarding the Company.

22.     The backdated stock options C. Olofson received and granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders.  Since May 7, 1997, C. Olofson has owned between 4.0% and 7.2% of Epiq's outstanding stock.  As of January 4, 2008, C. Olofson beneficially owned approximately 5.7% of Epiq's outstanding stock.  C. Olofson has exercised control of the Company through his share ownership, his relationship to his father (the single largest shareholder of the Company) and his deceptive conduct pleaded herein, to accomplish and perpetuate his self dealing and the self dealing of other defendants in backdated stock options. C. Olofson is a citizen of the State of Illinois.

23.     Defendant W. Bryan Satterlee ("Satterlee") has been a director of the Company since 1997.  Since the beginning of his tenure he has been a member of the Audit Committee and has served as a Chair of the Audit Committee since at least 2004.  He has also been a member

Company's Compensation Committee since its formation in 2002.  Until March 2004, Satterlee acted as a member of the Company's Stock Option Committee and granted backdated options to employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans.  Satterlee knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through his granting of hundreds of thousands of backdated options and receipt of tens of thousands of backdated options, Satterlee knew that he and other Epiq directors were backdating stock option grants.

24.     Satterlee participated in (and did work in connection with) four meetings of the Board of Directors in each of 1997-2000, and ten meetings, seven meetings and eight meetings of the Board of Directors in 2001-2003, respectively, and at least one meeting in 2004, during which he engaged in backdating options on Epiq's Stock Option Committee.  He also participated in (and did work in connection with) at least two meetings of Epiq's Board of Directors and Compensation Committee in each of 2005 and 2006, during which he engaged in backdating options.  Satterlee did work and communicated with the Company's external auditors in connection with at least three meetings from February 7, 1997 to April 11, 2001, six meetings in each of 2001 and 2003, and five, seven, ten, thirteen and eleven meetings, in 2002, 2004-2007, respectively, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a

restatement of the Company's financial statements and/or the withdrawal or modification of audit

opinions certifying the Company's financial reports.

25.     Although he disregarded that he and other of Epiq's directors were backdating stock

option grants, Satterlee participated in the preparation of, and approved, false and misleading

statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-K

and proxy statements, and Forms 4 and 5.  As pleaded herein, Satterlee engaged in *ultra vires* acts.

Satterlee also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act

and federal wire fraud and securities laws.  He sold over 54,000 shares of Epiq stock for proceeds of

approximately $704,000 during the relevant period based on his knowledge of material non-public

information regarding the Company.

26.     The backdated stock options Satterlee received and granted constituted illegal

compensation from Epiq that was not disclosed to the Company's shareholders.  Satterlee has

exercised control of the Company through his share ownership, his relationship to the single largest

shareholder of the Company, and his deceptive conduct pleaded herein, to accomplish and perpetuate

his self dealing and the self dealing of other defendants in backdated stock options.  Satterlee is a

citizen of the State of New Hampshire.

27.     Defendant Edward M. Connolly, Jr. ("Connolly") has been a director of the Company

since January 2001.  Since the beginning of his tenure he has been a member of the Audit

Committee.  He has also been a member Company's Compensation Committee since its formation in

2002. Until March 2004 Connolly acted as a member of the Company's Stock Option Committee

and granted backdated options to employees of the Company, in contravention of the express

authorization of the Company's shareholders and Epiq's stock option plans.  Connolly knew the

adverse non-public information about the business of Epiq, as well as its finances, markets, and

present and future business prospects, via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

28.    Connolly participated in (and did work in connection with) ten meetings, seven meetings and eight meetings of the Board of Directors in 2001-2003, respectively, and at least one meeting in 2004, during which he engaged in backdating options on Epiq's Stock Option Committee.  He also participated in (and did work in connection with) at least two meetings of Epiq's Board of Directors and Compensation Committee in each of 2005 and 2006, during which he engaged in backdating options.  Through his granting of tens of thousands of backdated options and receipt of thousands of backdated options, Connolly knew that he and other Epiq directors were backdating stock option grants.  Connolly did work and communicated with the Company's external auditors in connection with six meetings in each of 2001 and 2003, and five, seven, ten, thirteen and eleven meetings, in 2002, 2004-2007, respectively, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

29.    Although he disregarded that he and other of Epiq's directors were backdating stock option grants, Connolly participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-K and proxy statements, and Forms 4 and 5.  As pleaded herein, Connolly engaged in *ultra vires* acts.

Connolly also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws.

30.     The backdated stock options Connolly received and granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders.  Connolly has exercised control of the Company through his share ownership, his relationship to the single largest shareholder of the Company, and his deceptive conduct pleaded herein, to accomplish and perpetuate his self dealing and the self dealing of other defendants in backdated stock options.  Connolly is a citizen of the State of Kansas.

31.     Defendant James A. Byrnes ("Byrnes") has been a director of the Company since January 2003.  Since the beginning of his tenure he has been a member of the Audit Committee.  He has also been a member Company's Compensation Committee since the beginning of his tenure.  Until March 2004 Byrnes acted as a member of the Company's Stock Option Committee and granted backdated options to employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans.  Byrnes knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

32.     Byrnes participated in (and did work in connection with) eight meetings of the Board of Directors in 2003 and at least one meeting in 2004, respectively, during which he engaged in backdating options on Epiq's Stock Option Committee.  He also participated in (and did work in connection with) at least two meetings of Epiq's Board of Directors and Compensation Committee in each of 2005 and 2006, during which he engaged in backdating options.  Through his granting of hundreds of thousands of backdated options and receipt of tens of thousands of backdated options,

Byrnes knew that he and other Epiq directors were backdating stock option grants. Byrnes did work and communicated with the Company's external auditors in connection with six, seven, ten, thirteen and eleven meetings, in 2003-2007, respectively, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

33.    Although he disregarded that he and other of Epiq's directors were backdating stock option grants, Byrnes participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-K and proxy statements.   As pleaded herein, Byrnes engaged in *ultra vires* acts.   Byrnes also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws.

34.    The backdated stock options Byrnes granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders.   Byrnes has exercised control of the Company through his relationship to the single largest shareholder of the Company, and his deceptive conduct pleaded herein, to accomplish and perpetuate his self dealing and the self dealing of other defendants in backdated stock options.   Byrnes is a citizen of the State of Kansas.

35.    Defendant Joel Pelofsky ("Pelofsky") has been a director of the Company since July 2004. Since the beginning of his tenure he has been a member of the Audit Committee.   He has also been a member Company's Compensation Committee since the beginning of his tenure.   Pelofsky acted as a member of the Company's Compensation Committee and granted backdated options to

employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans. Pelofsky knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

36.      Pelofsky participated in (and did work in connection with) at least two meetings of the Board of Directors and at least two meetings of Epiq's Compensation Committee in each of 2005 and 2006, during which he engaged in backdating options. Through his granting of hundreds of thousands of backdated options and receipt of tens of thousands of backdated options, Pelofsky knew that he and other Epiq directors were backdating stock option grants. Pelofsky did work and communicated with the Company's external auditors in connection with ten, thirteen and eleven meetings, in 2005-2007, respectively, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

37.      Although he disregarded that he and other of Epiq's directors were backdating stock option grants, Pelofsky participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-K and proxy statements. As pleaded herein, Pelofsky engaged in *ultra vires* acts. Pelofsky also

committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws.

38.     The backdated stock options Pelofsky granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders. Pelofsky has exercised control of the Company through his relationship to the single largest shareholder of the Company, and his deceptive conduct pleaded herein, to accomplish and perpetuate his self dealing and the self dealing of other defendants in backdated stock options. Pelofsky is a citizen of the State of Missouri.

39.     Defendant Robert C. Levy ("Levy") was Corporate Secretary and a director of the Company during July 1988 to June 4, 2003. He has been General Counsel to the Company from time to time since July 1988. From February 7, 1997 to June 4, 2003, Levy was a member of the Audit Committee. He was also a member of the Company's Compensation Committee since its formation in 2002 until June 4, 2003. Until June 4, 2003, Levy acted as a member of the Company's Stock Option Committee and granted backdated options to employees of the Company, in contravention of the express authorization of the Company's shareholders and Epiq's stock option plans. Levy knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

40.     Levy participated in (and did work in connection with) four meetings of the Board of Directors in each of 1997-2000, and ten meetings, seven meetings and eight meetings of the Board of Directors in 2001-2003, respectively, during which he engaged in backdating options as a member of Epiq's Stock Option Committee. As Corporate Secretary, Levy was responsible for approving and documenting option grants, and attending and documenting Board meetings (among other

things).  He approved and documented option grants that were on their face backdated, in Company records, including minutes, and in SEC filings that he signed.  Through his granting of hundreds of thousands of backdated options and receipt of tens of thousands of backdated options, Levy knew that he and other Epiq directors were backdating stock option grants.

41.     Levy also did work and communicated with the Company's external auditors in connection with at least three meetings from February 7, 1997 to April 11, 2001, six meetings in each of 2001 and 2003, and five meetings in 2002, during which he withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

42.     Although he disregarded that he and other of Epiq's directors were backdating stock option grants, Levy participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Epiq's Reports on Form 10-K and proxy statements, and Forms 4 and 5.  As pleaded herein, Levy engaged in *ultra vires* acts.  Levy also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws.  The backdated stock options Levy received and granted constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders.  Levy is a citizen of the State of Kansas.

43.     Defendant Janice E. Katterhenry ("Katterhenry") was Chief Financial Officer and Corporate Secretary of Epic from August 1999 until September 30, 2001, at which time she relinquished her position as CFO but continued in an executive position at the Company.  As

Corporate Secretary, Katterhenry was also responsible for approving and documenting option grants, and attending and documenting Board meetings (among other things). She approved and documented option grants that were on their face backdated, in Company records, including minutes, and in SEC filings that she signed and/or otherwise approved (*e.g.*, proxy statements and Reports on Forms 10-K, and Forms 3, 4 and 5). Through this and her receipt of tens of thousands of backdated options, Katterhenry knew that she and other Epiq directors were backdating stock option grants.

44.    Katterhenry also participated in communications with the Company's external auditors in connection with management representation letters and otherwise for fiscal years ended 1999-2000 and interim periods in 2001, during which she withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

45.    Although she disregarded that Epiq's officers and directors were backdating stock option grants, Katterhenry participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and she signed Epiq's Reports on Form 10-K and 10-Q, proxy statements, and Forms 4 and 5. As pleaded herein, Katterhenry engaged in *ultra vires* acts. She also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws. The backdated stock options Katterhenry received and documented constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders. Katterhenry is a citizen of the State of Kansas.

46.     Defendant Elizabeth M. Braham ("Braham") has been Epiq's Chief Financial Officer since July 2002 and has acted as Corporate Secretary since January 2003. As Corporate Secretary, Braham was also responsible for approving and documenting option grants, and attending and documenting Board meetings (among other things). She approved and documented option grants that were on their face backdated, in Company records, including minutes, and in SEC filings that she signed and/or otherwise approved (*e.g.*, proxy statements and Reports on Forms 10-K, and Forms 3, 4 and 5). Through this and her receipt of hundreds of thousands of backdated options, Braham knew that Epiq officers and directors were backdating stock option grants.

47.     Braham also participated in communications with the Company's external auditors in connection with management representation letters and otherwise for fiscal years ended 2001-2007, during which she withheld from the auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options, (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense, and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

48.     Although she disregarded that Epiq's officers and directors were backdating stock option grants, Braham participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and she signed Epiq's Reports on Form 10-K and 10-Q, proxy statements, and Forms 4 and 5. As pleaded herein, Braham engaged in *ultra vires* acts. She also committed illegal acts by violating §17-12a501 of the Kansas Uniform Securities Act and federal wire fraud and securities laws. The backdated stock options Braham received and documented constituted illegal compensation from Epiq that was not disclosed to the Company's shareholders. Braham is a citizen of the State of Kansas.

- 19 -

49.     Because of defendants' positions, they knew the adverse non-public information about the business of Epiq, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Defendants, by their specialized financial expertise, were in a unique position to understand the business of Epiq, as well as its finances, markets, and present and future business prospects.

## DEFENDANTS' DUTIES

50.     Each officer and director of Epiq named herein owed the Company and Epiq shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Epiq's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Epiq. Further, the misconduct of Epiq's officers has been ratified by Epiq's Board, which has failed to take any legal action on behalf of the Company against them.

51.     By reason of their positions as officers, directors and fiduciaries of Epiq and because of their ability to control the business and corporate affairs of the Company, the defendants owed Epiq and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Epiq in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Epiq and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the defendants had a duty to refrain from utilizing their control over Epiq to divert assets to themselves via improper and/or unlawful practices. Defendants also had

a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

52.     Because of their positions of control and authority as directors or officers of Epiq, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the defendants who are or were directors, these acts include: (i) agreement to and/or acquiescence in defendants' option backdating scheme; (ii) willingness to cause Epiq to disseminate false proxy statements and periodic filings with the SEC, which contained false and misleading financial statements and failed to disclose defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Epiq, each of the defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Epiq shareholders and the financial markets but failed to do so.

53.     Due to defendants' breach of their fiduciary duty of loyalty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' stock option grants voided and gains from previous grants returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants since 1997 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have defendants revise the Company's financial statements to reflect the truth concerning these option grants.

54.     To discharge their duties, the directors of Epiq were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Epiq.  By virtue of such duties, the officers and directors of Epiq were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Epiq in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Epiq);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Epiq to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of Epiq to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Epiq's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Epiq and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Epiq's financial statements – including its expenses,

accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in Epiq stock by the officers and employees of Epiq; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from Epiq and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Epiq and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

55.     Each defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the defendants complained of herein involves *ultra vires* and illegal acts, bad faith violations of their obligations as directors and/or officers of Epiq, and a severe reckless disregard for their duties to the Company and its shareholders which defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the director defendants who comprised a super majority of Epiq's Board during the relevant period.

56.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the defendants from taking such illegal actions.  As a result, Epiq has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    improvidently paid executive compensation;

(b)    decreased shareholder equity as options are exercised as a result of the loss of market capitalization and the Company's damaged reputation in the investment community; and

(c)    incurring possible IRS penalties for improperly reporting compensation.

## AIDING AND ABETTING AND CONCERTED ACTION

57.    In committing the wrongful acts alleged herein, defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

58.    During all times relevant hereto, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert tens of millions of dollars to Epiq insiders and directors and causing Epiq to misrepresent its financial results; (ii) maintain defendants' executive and directorial positions at Epiq and the profits, power and prestige which defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Epiq, regarding defendants' compensation practices and Epiq's financial performance.

59.    The purpose and effect of defendants' common course of conduct was, among other things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operations and financial condition and to artificially inflate the price of Epiq common stock so they could dispose of millions of dollars of their own Epiq stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

60.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme

alleged herein and misrepresent Epiq's financial results. Each of the defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

61.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the defendants acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKDATING ALLEGATIONS

**Epiq's Stock Option Plans Authorized by the Shareholders**

62.     At all relevant times Epiq granted stock options pursuant to its 1995 Stock Option Plan and 2004 Equity Incentive Plan, as amended. The full Board of Directors administered the Company's stock option plans (including granting options) until March 2004, at which point a Compensation Committee that had been formed in June 2002 administered the plans (including granting options) and has continued doing so to date. A fundamental requirement of Epiq's stock option plans is and in all relevant instances was that the exercise price of stock options be based on fair market value (the closing price) of the Company's common stock on the date of the grant of the option.

63.     In all relevant instances with respect to incentive stock options ("ISOs") the price had to (and still must) be equal to (or not less than) the fair market value per share of stock on the date of the grant of the option. *See* 1995 Stock Option Plan (as amended, November 4, 1996, January 23 and February 3, 1997, March 3, 1998, April 7, 2003), §VI(b) ("the purchase price of a share of Common Stock subject to an ISO shall be . . . an amount equal to the fair market value of the Common Stock on the day the ISO is granted"); 2004 Equity Incentive Plan, §6(a) ("The price per

Share . . . ('exercise price') shall . . . not be less than 100% of the Fair Market Value of a share of Common Stock as of the date of grant of the option.").

64.    In all relevant instances the exercise price of ISOs to any employee owning more than 10% of the total combined voting power of all classes of stock of the Company, such as T. Olofson, had to (and still must) be not less than 110% of the fair market value per share of stock on the date of the option grant. *See* 1995 Stock Option Plan (as amended, November 4, 1996, January 23 and February 3, 1997, March 3, 1998, April 7, 2003), §V(f) ("the purchase price of the Common Stock subject to such Option shall be . . . at least 110 percent of the fair market value of the Common Stock on the day the Option is granted"); 2004 Equity Incentive Plan, §6(a) ("the exercise price may not be less than 110% of the Fair Market Value of a share of Common Stock as of the date of grant of the option").

65.    In all relevant instances until April 7, 2003, with respect to nonqualified stock options ("NSOs") the price had to be not less than 85% of the fair market value per share of stock on the date of the grant of the option. *See* 1995 Stock Option Plan (as amended, March 3, 1998), §VI(a) ("the purchase price of a share of Common Stock subject to an NSO . . . on the date the NSO is granted . . . may not be less than eighty-five percent (85%) of the fair market value of the Common Stock"). Beginning on April 7, 2003, the Company's plans required that the exercise price of NSOs be "equal to the fair market value of the Common Stock on the day the NSO is granted." 1995 Stock Option Plan (as amended, April 7, 2003), §VI(a).

66.    Also fundamental to Epiq's stock option plans is, and in all relevant instances was, that "fair market value shall be the closing price at which the Common Stock is traded." 1995 Stock Option Plan (as amended, November 4, 1996, January 23 and February 3, 1997, March 3, 1998, April 7, 2003), §VI(c). *See also* 2004 Equity Incentive Plan, §2(k) (defining "Fair Market Value" as "the officially-quoted closing selling price of the stock").

- 26 -

67.    These fundamental requirements directly contradict dating a stock option on a date prior to its grant, pricing a stock option as if it were dated prior to the date of the grant, or pricing a stock option at an intra-day low price as opposed to the closing market price.  Nonetheless, the Board and Compensation Committees over the years repeatedly approved stock options which on their face were backdated or backdated and priced at intra-day lows.

### Alleged Backdated Stock Option Grants

| Purported Option Grant Date (Expiration Date) | Price (split-adjusted price) | Directors & Officers Who Received Grants | Number of Options Received | Defendants Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|
| 7/10/1997 (7/10/2002) | $4.95 ($1.46) | C. Olofson | 84,375 | T. Olofson, C. Olofson, Satterlee |
| (7/10/2007) | $4.50 ($1.33) | A. Annillo | 16,875 | |
| | | R. Eichner | 16,875 | |
| | | S. MacDonald | 16,875 | |
| | | N. Trutna | 16,875 | |
| 12/01/1997 (12/01/2002) | $6.80 ($2.01) | C. Olofson | 84,375 | T. Olofson, C. Olofson, Satterlee |
| (12/01/2007) | | A. Annillo | 16,875 | |
| | | R. Eichner | 16,875 | |
| | | N. Trutna | 16,875 | |
| 9/01/1998 (9/01/2008) | $9.00 ($2.66) | C. Olofson | 101,250 | T. Olofson, C. Olofson, Satterlee |
| | | R. Butler | 16,875 | |
| 10/08/1998 (10/03/2008) | $8.25 ($2.44) | R. Winegar | 33,750 | T. Olofson, C. Olofson, Satterlee |
| 11/04/1999 (11/05/2009) | $4.06 ($1.20) | M. Rider | 500 | T. Olofson, C. Olofson, Satterlee |
| 12/10/1999 (12/10/2009) | $10.75 ($3.18) | C. Olofson | 67,500 | T. Olofson, C. Olofson, Satterlee |
| | | A. Annillo | 3,375 | |
| | | R. Butler | 3,375 | |
| | | J. Katterhenry | 3,375 | |
| | | T. Layton | 3,375 | |
| | | R. Winegar | 3,375 | |
| 7/03/2000 (7/03/2010) | $7.00 ($2.07) | Levy | 25,313 | T. Olofson, C. Olofson, Satterlee |
| | | Satterlee | 25,313 | |
| | | C. Olofson | 126,562 | |
| | | J. Katterhenry | 50,625 | |
| 1/02/2001 (1/02/2011) | $7.53 ($2.23) | C. Olofson | 227,812 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| | | W. Satterlee | 37,969 | |
| | | A. Annillo | 15,187 | |
| | | J. Katterhenry | 15,187 | |

| Purported Option Grant Date (Expiration Date) | Price (split-adjusted price) | Directors & Officers Who Received Grants | Number of Options Received | Defendants Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|
| | | T. Layton | 15,187 | |
| | | Levy | 37,969 | |
| | | S. MacDonald | 15,187 | |
| | | C. Murray | 15,187 | |
| 1/09/2001 (1/09/2011) | $17.25 ($5.11) | Connolly | 16,875 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| 7/25/2001 (7/25/2011) | $11.49 ($5.10) | C. Olofson | 168,750 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| | | A. Annillo | 3,375 | |
| | | J. Katterhenry | 3,375 | |
| | | T. Layton | 3,375 | |
| | | S. MacDonald | 3,375 | |
| | | C. Murray | 3,375 | |
| 1/14/2002 (1/14/2012) | $18.04 ($12.02) | Connolly | 7,500 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| | | Satterlee | 7,500 | |
| | | Levy | 7,500 | |
| | | C. Olofson | 75,000 | |
| | | L. Workman | 7,500 | |
| 6/13/2002 (6/13/2012) | $12.85 ($8.56) | C. Olofson | 112,500 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| | | A. Annillo | 31,500 | |
| | | T. Layton | 22,500 | |
| | | M. Rider | 6,000 | |
| | | L. Workman | 7,500 | |
| 8/05/2002 (8/05/2012) | $14.62 ($9.74) | Braham | 22,500 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| 12/13/2002 (12/13/2012) | $14.62 ($9.74) | M. Rider | 150 | T. Olofson, C. Olofson, Satterlee, Connolly, |
| | | A. Annillo | 3000 | |
| | | S. MacDonald | 3000 | |
| | | T. Layton | 3000 | |
| | | C. Murray | 3000 | |
| | | V. Holmes | 3000 | |
| | | L. Workman | 3000 | |
| 12/09/2003 (12/09/2013) | $15.64 ($10.43) | D. Fleming | 375 | T. Olofson, C. Olofson, Satterlee, Connolly, Byrnes |
| 2/14/2005 (2/14/2015) | $12.20 ($8.13) | T. Olofson | 375,000 | Satterlee, Connolly, Byrnes, Pelofsky |
| | | C. Olofson | 375,000 | |
| | | Satterlee | 11,250 | |
| | | Byrnes | 11,250 | |
| | | Pelofsky | 11,250 | |
| | | Connolly | 11,250 | |
| | | Braham | 225,000 | |
| 1/03/2006 (1/03/2016) | $18.96 ($12.64) | L. Mendizabal | 150,000 | Satterlee, Connolly, Byrnes, Pelofsky |

68.     During 1997-March 2004, T. Olofson, C. Olofson, Satterlee and Byrnes had the responsibilities to "administer" the Company's stock option plan.   Connolly additionally administered the plan from June 2002 until March 2004.  In June 2002, a Compensation Committee was formed and, acting as the Stock Option Plan Committee, it has exclusively administered the Company's stock option plans from March 2004 to date.   Responsibilities to administer the Company's stock option plans have never been anything less than full authority and sole discretion to (among other things), as a committee, grant stock options, determine the persons to whom and the time or times at which options will be granted, and determine the type and number of options to be granted and the terms of such options. *See, e.g.,* 1995 Stock Option Plan (as amended, November 4, 1996, January 23 and February 3, 1997, March 3, 1998, April 7, 2003), §II(a) ("The Plan shall be administered by the Board of Directors . . . or a Stock Option Plan Committee . . . .   [T]he Committee shall have full authority . . . to make all . . . determinations necessary or desirable for the administration of the Plan."); 1995 Stock Option Plan (as amended, November 4, 1996, January 23 and February 3, 1997, March 3, 1998, April 7, 2003), §§V(a)-(b), VI(a)-(b) (the Committee shall in its discretion determine when options shall be granted and the purchase price of the common stock subject to the options); 2004 Equity Incentive Plan, §3 ("The Plan shall be administered by the Committee . . . .  [T]he Committee shall be authorized to (i) select persons to participate in this Plan; (ii) determine the form and substance of grants made under this Plan to each participant, and the conditions and restrictions, if any, subject to which such grants will be made . . . .  Decisions of the Committee on all matters relating to this Plan shall be in the Committee's sole discretion and shall be conclusive and binding on all parties.").

69.     Abusing their exclusive authority and committing *ultra vires* acts, defendants T. Olofson, C. Olofson, Satterlee, Connolly, Byrnes and Levy violated Epiq's stock option plans in that they: (i) backdated and retroactively priced stock options; and (ii) in collusion with one another,

- 29 -

other defendants, or former executives of the Company, determined and granted option awards dated with dates prior to the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known. Each of these defendants abused their authority in causing the backdating and mispricing to occur without disclosure.

70.     An objective analytical review using court-accepted methodologies, of all publicly reported stock option dates in option grants to directors and officers of Epiq between 1997 and 2005 reveals that discretionary stock option grants were often dated as of: (i) near or on the very day that Epiq's stock price hit its low price for the month, quarter and/or year; and/or (ii) in advance of significant stock price increases. Indeed, over 30% of option grants to Epiq's directors and officers (reporting persons) were dated as of and priced based on the lowest or second lowest price of the month in Epiq's share price. The odds of that happening absent intentional manipulation are so extremely remote (well over 1 in 1,000,000) that backdating is the most rational explanation. And that is not even considering the fact that approximately 20% of the reported option grants were dated as of and priced based on the lowest or second lowest price of the *quarter* for Epiq's share price, which is even more improbable.

71.     The Merrill Lynch methodology examines the "20 day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted."[1] According to the Merrill Lynch methodology, "companies should not be generating any systematic excess return in comparison to other investors as a result of how options pricing events

---

[1]     Several decisions acknowledge the usefulness of the Merrill Lynch analysis in determining whether a pattern of backdating exists. *See, e.g., Belova v. Sharp*, No. CV-07-299-MO, 2008 U.S. Dist. LEXIS 19880, at *11-*12 (D. Or. Mar. 13, 2008); *In re CNET Networks, Inc.*, 483 F. Supp 2d 947, 957 (N.D. Cal. 2007); *In re Computer Scis. Corp. Derivative Litig.*, No. CV 06-05288 MRP (Ex), 2007 U.S. Dist. LEXIS 25414, at *44-*45 (C.D. Cal. Mar. 27, 2007); *Ryan v. Gifford*, 918 A.2d 341, 354-55 (Del. Ch. 2007); *Conrad v. Blank*, 940 A.2d 28, 39 n.30 (Del. Ch. 2007).

are timed." This 20-day analysis makes sense because, "[t]heoretically, if the timing of options grants is an arm's length process, and companies haven't systematically taken advantage of their ability to backdate options within the 20-day windows that the law provided prior to the implementation of Sarbanes Oxley in 2002, there shouldn't be any difference between the two measures." This analysis has also been referred to as "the easiest and simplest way" to measure the pricing of options. New York University finance professor David Yermick and University of Iowa finance professor Erik Lie said that 20-day post-grant price surges are "a reasonable yardstick to detect possible backdating" and that "[u]sing a longer period, such as a year, wouldn't be a good way to spot backdating of a few days or weeks because the longer-term trading would overwhelm any backdating effect."

72.     Using Merrill Lynch's methodology in comparing annualized 20-day increases/decreases in Epiq's stock price following management grant dates ("management return") to public "investor" annualized returns ("public investor return"), plaintiff analyzed all of the publicly reported stock option dates to directors and officers of Epiq between 1996 and 2007. There were nearly 50 separate grant dates. The analysis revealed that, between 1996 and 2007, the average management return on publicly reported discretionary grants was approximately 193%, while the average public investor return was approximately 49%. In other words, there was a significant disparity between management return and public investor return – the average management return being nearly 400% *higher* than the public investor return.

73.     Furthermore, the disparity of returns demonstrated by the Merrill Lynch analytical methodology is consistent with the disparity of returns shown when the "management return" of the individually alleged backdated grants in particular is determined and compared with the "public investor return" in the same fiscal year. These option grants also fell on suspiciously fortuitous dates, *e.g.*, dates where Epiq's closing stock price was the lowest or near the lowest of the month

quarter or year.  Furthermore, when the intraday low trading price was lower than the closing price

on the purported option date with respect to a number of these grants, the price was based on the

intraday low trading price of the option date, not the closing price, in contravention of Epiq's stock

option plans.

**Summary of Alleged Backdated Option Date Closing Price Rankings and Comparison of Returns on Alleged Backdated Option Grants**

| Option Date | Management Option Date Closing Price Ranking by Month, Quarter or Year | Public Investor Return | Management Return |
|---|---|---|---|
| 07/10/97 | Lowest of Month and Quarter | 276.0% | 550.8% |
| 12/01/97 | Second Lowest of Month and Quarter | 276.0% | 450.0% |
| 09/01/98 | Lowest of Month, Third Lowest of Quarter | -13.0% | 374.4% |
| 10/08/98 | Lowest of Month, Quarter and Year | -13.0% | 376.2% |
| 11/04/99 | Third Lowest of Month and Quarter | 57.9% | 419.4% |
| 12/10/99 | Lowest of Month | 57.9% | 293.4% |
| 07/03/00 | Lowest of Month and Quarter | 14.2% | 428.4% |
| 01/02/01 | Lowest of Month and Quarter | 157.1% | 802.8% |
| 01/09/01 | Second Lowest of Month and Quarter | 157.1% | 703.8% |
| 07/25/01 | Lowest of Month and Quarter | 157.1% | 345.6% |
| 01/14/02 | Lowest of Month | -22.25% | 205.2% |
| 06/13/02 | Second Lowest of Month, Quarter and Year | -22.25% | 174.6% |
| 08/05/02 | Lowest of Month | -22.25% | 417.6% |
| 12/13/02 | Lowest of Month, Third Lowest of Quarter | -22.25% | 284.4% |
| 12/09/03 | Lowest of Month | 12.8% | 316.8% |
| 02/14/05 | Lowest of Month, Quarter and Year | 51.7% | 176.4% |
| 01/03/06 | Lowest of Month | -8.5% | 329.4% |

74.    In determining alleged backdated option grants, plaintiff also screened each grant

according to the methodology used by the Center for Financial Research and Analysis ("CFRA").

"CFRA considers a company's options backdating risk to be significant when a company has, on

three or more occasions, granted options to executives at exercise prices and dates that matched

exactly or were close to a 40-day low in the company's stock price."  In assessing the likelihood of

backdating, the CFRA Report uses the following criteria: (i) where the price on the grant date is

within 105% of the 10- or 40-day period stock price low following date of grant; and (ii) the stock

price range for the 40-day period (highest stock price minus lowest stock price) is greater than 10%

of the lowest stock price. Each alleged backdated stock option grant tested positive under these criteria. In addition, on more than three occasions the Company granted options to executives at exercise prices and dates that matched exactly or were close to a 40-day low in Epiq's stock price. Indeed, at least ten option grants to executives were dated and priced to match exactly or were close to a *quarterly* low in Epiq's stock price.

75. Another indication of backdating may be seen in the period of time between the purported grant date and the date the grant was disclosed to the SEC. Thus, plaintiff also reviewed the amount of time between the purported stock option grant date and disclosure of the grants to the SEC via Forms 3, 4 or 5. Grants that are not disclosed to the SEC in a timely fashion are more likely backdated. "If executives are backdating, a longer reporting lag implies that, on average, they were backdating aggressively, seeking a lower exercise price. This in turn implies that the extent of stock price rise following the manager-designated grant date will be positively correlated with the reporting lag." M. P. Narayanan, Cindy A. Schipani & H. Nejat Seyhun, *The Economic Impact of Backdating of Executive Stock Options*, 105 Mich. L. Rev. 1597, 1603 (2007).

76. With respect to a number of the alleged backdated option grants there are no known SEC Forms 4 or Thompson financial data derived from such filings showing the changes in beneficial ownership from these purported grants – the options were not evidenced until *years* later, when defendants made SEC filings indicating the *exercise* of these options. In other cases Forms 4 or holdings records evidencing these backdated grants (and others) were filed by defendants and others many months or over a year after the purported grant date.

77.    For the stock option grants plaintiff alleges were backdated after Sarbanes-Oxley was enacted, plaintiff reviewed the price movement in the lag time between the grant date and the date defendants disclosed the grant to the SEC.[2]

78.    Similarly, stock option grants are more likely backdated when they are discretionary and granted by a sporadic method.  Accordingly, plaintiff also reviewed each grant to determine whether or not it was granted in a sporadic fashion or on a fixed date pursuant to a non-discretionary stock option plan.

79.    The following describes some of the backdated option grants and their recipients.

---

[2]    "It has been documented that the Sarbanes-Oxley Act of 2002 ("SOX") has not been successful in fully eliminating clandestine backdating or other forms of manipulation such as springloading . . . ." *Narayanan et al.*, *supra*, 105 Mich L. Rev. at 1601.

**Option Grants Backdated to July 10, 1997**

80.    These options were granted to C. Olofson, Albert Annillo ("Annillo"), Reed Eichner ("Eichner"), Sally MacDonald ("MacDonald") and Nanci Trutna ("Trutna"). They were dated as of and priced based on Epiq's lowest closing price for the month and quarter. The grant to C. Olofson was priced at 110% of market closing price on the option date, and the grants to the remaining recipients were priced equal to market closing price on the option date. The 10- and 20-day increases in Epiq's stock price following the option date were 16.7% and 30.6%, respectively, with the annualized increases being 601.2% and 550.8%, respectively.



**Option Grants Backdated to December 1, 1997**

81.     These options were granted to C. Olofson, Annillo, Eichner and Trutna.  They were dated as of the date on which Epiq's stock closed at the second lowest closing price for the month. Not only were these options backdated in contravention of Epiq's stock option plans, they were also priced based on the intraday trading low in Epiq's stock price, in contravention of Epiq's stock option plan requirement that fair market value is determined by the market closing price (not the intraday low).  The 10- and 20-day increases in Epiq's stock price following the option date were 9.4% and 25.0%, respectively, with the annualized increases being 338.4% and 450.0%, respectively.



- 36 -

**Option Grants Backdated to September 1, 1998**

82.     These options were granted to C. Olofson and Reve Butler ("Butler").  They were dated as of the date on which Epiq's stock closed at the lowest closing price for the month and third lowest closing price for the quarter.  The Company's stock price closed lower than the exercise price for these options only 5 days in 1998.  Not only were these options backdated in contravention of Epiq's stock option plans, they were also priced based on the intraday trading low in Epiq's stock price, in contravention of Epiq's stock option plan requirement that fair market value is determined by the market closing price (not the intraday low).  The 10- and 20-day increases in Epiq's stock price following the option date were 5.6% and 20.8%, respectively, with the annualized increases being 201.6% and 374.4%, respectively.  In comparison, public investors who held Epiq's stock during 1998 *lost* 13.0%.



**Option Grants Backdated to October 8, 1998**

83.     These options were granted to Richard Winegar ("Winegar").  They were dated as of and priced based on Epiq's lowest closing price for the month, quarter and year.  The 10- and 20-day increases in the Company's stock price following the option date were 22.5% and 20.9%, respectively, with the annualized increases being 810.0% and 376.2%, respectively.  Again, public investors who held Epiq's stock during 1998 *lost* 13.0%.



EPIQ Systems, Inc.
September 8, 1998 to November 9, 1998

**Option Grants Backdated to November 4, 1999**

84.     These options were granted to Michael Rider ("Rider").  They were dated as of and priced based on Epiq's third lowest closing price for the month and quarter.  The 10- and 20-day increases in the Company's stock price following the option date were 0.0% and 23.3%, respectively, with the annualized increases being 0% and 419.4%, respectively.



- 39 -

**Option Grants Backdated to December 10, 1999**

85.     These options were granted to C. Olofson, Annillo, Butler, Katterhenry, Thomas

Layton ("Layton") and Winegar.  They were dated as of the date on which Epiq's stock closed at the

lowest closing price for the month.  Not only were these options backdated in contravention of

Epiq's stock option plans, they were also priced based on the intraday trading low in Epiq's stock

price, in contravention of Epiq's stock option plan requirement that fair market value be determined

by the market closing price (not the intraday low).  The 10- and 20-day increases in the Company's

stock price following the option date were 15.1% and 16.3%, respectively, with the annualized

increases being 543.6% and 293.4%, respectively.



**EPIQ Systems, Inc.**
October 1, 1999 to December 6, 1999

**Option Grants Backdated to July 3, 2000**

86.     These options were granted to Levy and Satterlee.  They were dated as of and priced based on Epiq's lowest closing price for the month and quarter.  The 10- and 20-day increases in the Company's stock price following the option date were both 23.8%, with the annualized increases being 856.8% and 428.4%, respectively.



- 41 -

**Option Grants Backdated to January 2, 2001**

87.     These options were granted to C. Olofson, Satterlee, Annillo, Katterhenry, Layton, Levy, MacDonald and Catherine Murray ("Murray").  They were dated as of and priced based on Epiq's lowest closing price for the month and quarter.  The 10- and 20-day increases in the Company's stock price following the option date were 24.7% and 44.6%, respectively, with the annualized increases being 889.2% and 802.8%, respectively.



**EPIQ Systems, Inc.**
December 1, 2000 to February 2, 2001

**Option Grants Backdated to January 9, 2001**

88.     These options were granted to Connolly.  They were dated as of and priced based on

Epiq's second lowest closing price for the month and quarter.  The 10- and 20-day increases in the

Company's stock price following the option date were 37% and 39.1%, respectively, with the

annualized increases being 1332.0% and 703.8%, respectively.



- 43 -

**Option Grants Backdated to July 25, 2001**

89.     These options were granted to C. Olofson, Annillo, Katterhenry, Layton, MacDonald and Murray.  They were dated as of and priced based on Epiq's lowest closing price for the month and quarter.  The 10- and 20-day increases in the Company's stock price following that date were 19.5% and 19.2%, respectively, with the annualized increases being 702.0% and 345.6%, respectively.



**EPIQ Systems, Inc.**
June 25, 2001 to August 27, 2001

**Option Grants Backdated to January 14, 2002**

90.    These options were granted to Connolly, Satterlee and Levy. They were dated as of and priced based on Epiq's lowest closing price for the month. The 10- and 20-day increases in the Company's stock price following that date were 10.3% and 11.4%, respectively, with the annualized increases being 370.8% and 205.2%, respectively. In comparison, public investors who held Epiq's stock during 2002 *lost* 22.5%.



**Option Grants Backdated to June 13, 2002**

91.     These options were granted to C. Olofson, Annillo, Layton, Rider and Leah Workman

("Workman").  They were dated as of and priced based on Epiq's second lowest closing price for the

month, quarter and year.  The 10- and 20-day increases in the Company's stock price following that

date were 22.1% and 9.7%, respectively, with the annualized increases being 795.6% and 174.6%,

respectively.  Again, public investors who held Epiq's stock during 2002 *lost* 22.5%.

**EPIQ Systems, Inc.**
May 13, 2002 to July 15, 2002

**Option Grants Backdated to August 5, 2002**

92.    These options were granted to Braham.  They were dated as of and priced based on

Epiq's second lowest closing price for the month.  The 10- and 20-day increases in the Company's

stock price following that date were 25.9% and 23.2%, respectively, with the annualized increases

being 932.4% and 417.6%, respectively.  Public investors who held Epiq's stock during 2002 *lost*

22.5%.



- 47 -

**Option Grants Backdated to December 13, 2002**

93.     These options were granted to Rider.  They were dated as of and priced based on

Epiq's lowest closing price for the month and third lowest closing price for the quarter.  The 10- and

20-day increases in the Company's stock price following that date were 2.3% and 15.8%,

respectively, with the annualized increases being 82.8% and 284.4%, respectively.  Meanwhile,

public investors who held Epiq's stock during 2002 *lost* 22.5%.



**EPIQ Systems, Inc.**
November 13, 2002 to January 13, 2003

- 48 -

**Option Grants Backdated to December 9, 2003**

94.     These options were granted to Douglas Fleming ("Fleming"). They were dated as of

and priced based on Epiq's lowest closing price for the month. The Company's stock price closed

lower than the exercise price for this option only 12 days in 2003. The 10- and 20-day increases in

Epiq's stock price following that date were 13.1% and 17.6%, respectively, with the annualized

increases being 471.6% and 316.8%.



**EPIQ Systems, Inc.**
November 7, 2003 to January 9, 2004

**Bullet Dodge Option Grants Backdated to February 14, 2005**

95.     These options were granted to T. Olofson, C. Olofson, Braham, Byrnes, Satterlee, Connolly and Pelofsky.  They were dated as of and priced based on Epiq's lowest closing price for the month, quarter and year.  The 10- and 20-day increases in Epiq's stock price following that date were 5.5% and 9.8%, respectively, with the annualized increases being 198.0% and 176.4%, respectively.



96.     This option grant was manipulated in two independent and actionable ways.  First, the grant was a bullet-dodging event.  Second, it was backdated once defendants ascertained Epiq's stock price was fully depressed, by virtue of waiting for the stock price to ascend for two trading days.

97.     Approaching the end of Epiq's fiscal year ended December 31, 2004, T. Olofson, C. Olofson, Braham, Satterlee, Byrnes, Connolly and Pelofsky became aware that the Company would report fourth quarter earnings per share well below the bottom of the range of the Company's EPS guidance to analysts and published expected earnings by analysts.  The earnings miss expected was substantial: 25% less than the prior year's fourth quarter earnings and 25% less than the lowest end of the range of management's guidance (and published analyst expectations) for the quarter.  These defendants knew Epiq's forthcoming earnings report would at a minimum have a short-term damning effect on Epiq's stock price.  Consequently, the Board issued no stock options for months. Expecting the dramatic earnings miss (one of the largest the Company had ever experienced) would depress Epiq's stock price below fair market value, the insiders waited to garner stock options until after the Company decided to issue its fourth quarter and year-end financial results.  This grant not only violated the fair market value exercise price restrictions of Epiq's stock option plans, the timing of grants in this manner (bullet dodging) was contrary to the shareholder-approved purposes of Epiq's stock option plans.

98.     On February 7, 2005, the Company announced its fourth quarter and year-end financial results for the quarter and year ended December 31, 2004.  Adjusted earnings per share were $0.17, well below the $0.24 EPS of the previous fourth quarter, and well below the bottom end of the range of management guidance and analyst expectations of $0.24-$0.28 per share.  Fiscal year-end earnings were similarly below expectations.  As analysts issued their negative reports, Epiq's stock price plummeted, posting the single largest five-day loss of the fiscal year.

99.     To ensure they could price options at the lowest price possible, the Board then waited until Epiq's stock price had turned back upward for nearly two days and then backdated a massive amount of option grants – the largest amount of options granted insiders in the Company's history – to February 14, 2005, the lowest closing price since the previous earnings announcement.  The

insiders' plan worked well.  In retrospect, that closing price turned out to be the lowest closing price of the year.

100.    T. Olofson, C. Olofson and Braham faired best.  In total, based on this single grant, they received from the Compensation Committee (Satterlee, Byrnes, Connolly and Pelofsky) nearly 38% of all options granted to all employees in fiscal 2005.  As *quid pro quo* for acquiescing in the scheme to grant Epiq's top officers these options, T. Olofson and C. Olofson proposed, and the Compensation Committee approved, granting the Compensation Committee options with the same date *and* accelerating the vesting of unvested options for only the Compensation Committee and select insiders.

**Option Grants Backdated to January 3, 2006**

101.    These options were granted to Lorenzo Mendizabal ("Mendizabal").  They were dated as of and priced based on Epiq's lowest closing price for the month.  The Company amended Mendizabal's employment agreement and manipulated the date of effectiveness of a title change to falsely rationalize the backdated option date.  The 10- and 20-day increases in Epiq's stock price following that date were 7.1% and 18.3%, respectively, with the annualized increases being 255.6% and 329.4%, respectively.  Meanwhile, public investors who held Epiq's stock during 2006 *lost* 8.5%.



EPIQ Systems, Inc.
November 28, 2005 to January 30, 2006

102.    The issuance of options identified above violated Epiq's stock option plans that required the exercise price of options be based on the fair market value of Epiq's common stock

(defined as the closing price) on *the date of grant*. Rather, the options identified above were ***not*** dated with the date when they were granted and were not priced based on the fair market value of Epiq's common stock on the date of grant. Furthermore, a number of the options were ***not*** priced based on the closing price but rather on a lower, intraday low price. As alleged herein, these *ultra vires* acts also contradicted the Company's statements in SEC filings and other reports to Epiq's shareholders and violated federal and state securities laws. The secret practice of backdating stock option grants to themselves and their colleagues was in breach of defendants' fiduciary duties, including their duties of good faith, honesty and loyalty, owed to Epiq and its shareholders.

103. The backdating, among other things, enabled defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options and to avoid having to expense the in-the-money portion as compensation expense and thus avoid reductions in the Company's net income. Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Epiq that were less than they should have paid, had the options not been granted in-the-money.

104. The backdating also conferred great personal financial benefits on defendants. Epiq's stock traded at prices propelled in part by the false financial statements defendants had caused the Company to issue. Indeed, Epiq's stock price significantly increased in response to the Company's reported financial statements that overstated income, net income, and earnings per share as a result of the backdating. While the price of Epiq's stock was artificially inflated, defendants and other insiders engaged in insider trading, selling more than $35 million worth of the Company's stock in violation of the securities laws. And Epiq's directors in particular profited handsomely from the backdating. Those on the Board who engaged in backdating, alone, cashed in their options for over $29 million.

- 54 -

## EPIQ'S FALSE AND MISLEADING PROXY STATEMENTS

105.   In its proxy statements the Company (and numerous defendants) repeatedly communicated to Epiq's shareholders: (i) that stock option grants would be determined pursuant to authorization of the shareholders and in accordance with Epiq's stock option plans, (ii) the Company had been granting and would continue to grant incentive stock options dated and priced based on fair market value on the date of the grant of the option, in accordance with Epiq's stock option plans, (iii) that stock options were being granted prudently and consistent with the Company's compensation policies to compensate management through future growth in the Company's market value (*i.e.*, not by granting backdated "in-the-money" stock options), so that option holders would benefit only when, and to the extent, the Company's stock price increased after the grant, and (iv) that the audit committee had fulfilled its duties to help ensure the adequacy of the Company's internal controls in recommending the inclusion of the Company's financial statements in its periodic SEC filings. The proxies also referenced options prices and grant dates (identifiable by expiration date or otherwise) in stating the equity holdings of officers and directors, but omitted to state that the grants were backdated and therefore stock option compensation was artificially inflated.

106.   But the statements in Epiq's proxies (many of which are identified below) were materially false and misleading and omitted material information about the Company's improper stock option practices, as detailed herein. In truth, and as those who signed and approved the Company's proxy statements knew or were negligent or severely reckless in not knowing, stock options at Epiq were: (i) backdated in violation of the Company's stock option plans; (ii) determined and granted in contravention of the vested authority provided by shareholders and the stock option plans; and (iii) dated with dates prior to the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known. Furthermore, those

defendants who sat on the audit committee were in fact circumventing the Company's internal controls and withholding from Epiq's external auditors their knowledge of backdating.

107.    As former SEC Chairman Harvey L. Pitt stated: "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

108.    By issuing false and misleading statements in Epiq's proxy statements, the defendants identified below were able to: (i) increase the numbers of authorized shares of common stock of Epiq from which defendants could gain shares by exercise of their backdated stock options; (ii) gain the ability to grant to themselves and others backdated stock options; and (iii) obtain elected directorships enabling them to perpetuate the scheme.  Were the truth disclosed, the Company's shareholders would not have reasonably followed defendants' recommendations concerning the proposals submitted for their approval in the Company's proxy statements identified below.

109.   With respect to (i) above, for example, C. Olofson increased his net holdings after exercises of options and sales of stock, as follows:



EPIQ Systems, Inc.
Shares of Company Stock Beneficially Owned

110.    Similarly, T. Olofson steadily increased his net holdings through issuances of stock options pursuant to stock option plan amendments and adoptions *via* false and misleading proxy statements, as alleged below, to over 5 million shares beneficially owned as of June 4, 2008.



111.    Braham similarly increased her net holdings to 775,000.

112.    Epiq relied upon the facts stated in the Company's false and misleading proxy statements to seek the shareholders' vote for approval of the proposals identified herein. Thus, both the Company and its shareholders relied on the following materially false proxy statements.

**Proxy Statement Filed in Connection with the 1998 Annual Meeting**

113.    On or about June 2, 1998, Epiq filed with the SEC its definitive proxy statement for the 1998 annual meeting of shareholders ("1998 Proxy Statement"). The 1998 Proxy Statement was signed by T. Olofson and Levy and reviewed and approved by T. Olofson, C. Olofson, Levy and Satterlee.

114.   The 1998 Proxy Statement made numerous significant representations concerning Epiq's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

115.   The 1998 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.   When identifying stock option grants, including the backdated purported December 1, 1997 grant, the 1998 Proxy Statement stated the option grant prices were based on "the fair market value of the Common Stock on the date of grant." 1998 Proxy Statement at 5.

116.   In recommending approval of an amendment to the 1995 Stock Option Plan to increase the maximum number of shares that could be issued under the plan from 270,000 to 500,000, the 1998 Proxy Statement stated (among other things) that the purpose of the plan was to align director, officer and employee interests with shareholder interests by awarding options such that equity ownership would increase in value as the Company's performance increased.  1998 Proxy Statement at 9.  It further stated the exercise price of options granted under the plan would be based on "the fair market value of the Common Stock on the date of grant."  *Id.* at 9-10.

117.   The 1998 Proxy Statement representations were made in connection with and essential to a number of proposals Epiq's Board made to the Company's shareholders for a vote.

(a)      The first proposal concerned "ELECTION OF DIRECTORS"– including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended "A VOTE FOR THE ELECTION OF THE NOMINEES." 1998 Proxy Statement at 3.

(b)      The second proposal was to "AMEND THE 1995 STOCK OPTION PLAN" to increase the number of shares of common stock authorized for issuance pursuant to the plan from

- 59 -

270,000 to 500,000 shares. Each defendant then a director explicitly recommended Epiq's shareholders approve the amendment: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE PROPOSAL TO AMEND THE COMPANY'S STOCK OPTION PLAN TO INCREASE THE NUMBER OF SHARES OF COMMON STOCK AVAILABLE FOR THE GRANT OF STOCK OPTIONS THEREUNDER." *Id.* at 11.

**Proxy Statement Filed in Connection with the 2000 Annual Meeting**

118.   On or about June 7, 2000, Epiq filed with the SEC its definitive proxy statement for the 2000 annual meeting of shareholders ("2000 Proxy Statement"). The 2000 Proxy Statement was signed by T. Olofson and Katterhenry and reviewed and approved by T. Olofson, C. Olofson, Katterhenry, Levy and Satterlee.

119.   The 2000 Proxy Statement made numerous significant representations concerning Epiq's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)   The 2000 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future. When identifying stock option grants, including the backdated purported December 10, 1999 grant, the proxy represented the option was granted on December 10, 1999, by stating a corresponding expiration date, 2000 Proxy Statement at 6, which the proxy (and Epiq's 1995 Stock Option Plan) stated was ten years from the date of grant.

(b)   In recommending approval of an amendment to the 1995 Stock Option Plan to increase the maximum number of shares that could be issued under the plan from 500,000 to 800,000, the 2000 Proxy Statement stated (among other things) that the purpose of the plan was to align director, officer and employee interests with shareholder interests by awarding options such that equity ownership would increase in value as the Company's performance increased. *Id.* at 10.

It further stated the exercise price of options granted under the plan would be based on "the fair market value of the Common Stock on the date of grant." *Id.* at 11.

120.    The 2000 Proxy Statement representations were made in connection with and essential to a number of proposals Epiq's Board made to the Company's shareholders for a vote.

(a)    The first proposal concerned "ELECTION OF DIRECTORS"– including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended "a vote FOR the election of the nominees." 2000 Proxy Statement at 4.

(b)    The second proposal was to "INCREASE THE COMPANY'S AUTHORIZED COMMON STOCK" by amending the Company's Articles of Incorporation such that the number of shares of authorized common stock would be increased from 10,000,000 shares to 20,000,000 shares, for such purposes including stock option issuances "pursuant to employee stock and option plans." *Id.* at 8. Each defendant then a director explicitly recommended Epiq's shareholders approve the proposal: "The Board of Directors recommends that shareholders vote FOR the proposal to amend the Company's Articles of Incorporation to increase the Company's authorized shares of Common Stock." *Id.* at 9.

(c)    The third proposal was to "AMEND THE 1995 STOCK OPTION PLAN," to increase the number of shares of common stock authorized for issuance pursuant to the Plan, from 500,000 to 800,000 shares. Each defendant then a director explicitly recommended Epiq's shareholders approve the amendment: "The Board of Directors recommends that shareholders vote FOR the proposal to amend the Company's Stock Option Plan to increase the number of shares of Common Stock available for the grant of stock options thereunder." *Id.* at 14.