**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ALASKA ELECTRICAL PENSION   )
FUND, Derivatively on Behalf of EPIQ  )
SYSTEMS, INC.,                   )
                              )
       **Plaintiff,**         )
                              )   **CIVIL ACTION**
v.                        )
                              )   **Case No. 08-2344-CM**
TOM W. OLOFSON, et al,      )
                              )
     **Defendants,**       )
                              )
        **and**           )
                              )
EPIQ SYSTEMS, INC., a Missouri   )
Corporation,                )
                              )
     **Nominal Defendant.**   )
_____)

## MEMORANDUM AND ORDER

Plaintiff Alaska Electrical Pension Fund brings this shareholder-derivative action claiming that defendants, high-ranking officers and directors of nominal defendant Epiq Systems, Inc.'s board of directors, participated in a widespread backdating scheme spanning nearly ten years. Plaintiff advances eleven derivative causes of action. In other words, plaintiff advances claims that it contends Epiq—the company—has against defendants. Plaintiff does not bring any claim on its own behalf.

Counts I, II, and III are federal securities laws claims arising from the alleged backdating of stock option grants. Specifically, plaintiff claims that defendants violated (1) Section 14(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), which prohibits misrepresentations or omissions in proxy statements; (2) Section 10(b) of the Exchange Act, which prohibits fraud in connection with the purchase or sale of securities; and (3) Section 29(b) of the Exchange Act, which

prohibits contracts (here, the option contracts), entered into in connection with securities fraud.

Counts IV through XI are state law claims, also arising from the alleged backdating scheme: (1) breach of fiduciary duty and/or aiding and abetting a breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) constructive fraud; (5) corporate waste; and (6) unjust enrichment.  Plaintiff also seeks an accounting and rescission of the allegedly backdated options.

The case is before the court on Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 11).  Defendants ask the court to dismiss plaintiff's complaint on a number of bases.  The court will address each argument in turn.

## I.  STANDARD OF REVIEW

Defendants move to dismiss plaintiff's claims under Fed. R. Civ. P. 12(b)(6).  This court will grant a Rule 12(b)(6) motion to dismiss only when the factual allegations fail to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  While the factual allegations need not be detailed, the claims must set forth entitlement to relief "through more than labels, conclusions, and a formulaic recitation of the elements of a cause of action."  *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1216 (D. Kan. 2008).  The allegations must contain facts sufficient to state a claim that is plausible, rather than merely conceivable.  *Id.*

"All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).  The court construes any reasonable inferences from these facts in favor of plaintiff.  *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). The issue in reviewing the sufficiency of a complaint is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support its claims.  *Scheuer v. Rhodes*, 416 U.S. 232,

236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

In the context of securities litigation, the Tenth Circuit has warned that dismissal is "difficult to obtain" due to the fact-sensitive nature of the relevant issues. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). Dismissal is appropriate, however, "where the alleged misstatements or omissions are plainly immaterial," or where the plaintiff has failed to satisfy established pleading requirements. *Id.*

## II.  FACTUAL BACKGROUND

Epiq is a Missouri corporation with its principal place of business in Kansas City, Kansas. Plaintiff is an Alaska entity that first purchased Epiq stock on July 31, 2001. Plaintiff has held Epiq stock since that time. Defendants are the CEO and COO of Epiq (Tom W. Olofson and Christopher E. Olofson), who also serve on the company's board of directors; the independent members of the board of directors (W. Bryan Satterlee, Edward M. Connolly, Jr., James A. Byrnes, and Joel Pelofsky); one former director (Robert C. Levy); the company's current CFO (Elizabeth M. Braham); and a former CFO (Janice E. Katterhenry).

Plaintiff alleges that on seventeen occasions ranging in date from 1997 through 2006, defendants improperly granted or allowed others to grant backdated stock options to themselves and other directors and employees. Plaintiff contends that these stock options were not actually granted on the date represented by Epiq to be the date of the grant; instead, the options were granted on a later date but backdated to a day with a lower price.

The alleged backdating had multiple effects: (1) it violated the terms of the company's stock-option and equity incentive plans, which required that options be priced at the fair market value of the stock on the date of the grant; (2) it rendered the company's annual proxy statements and other forms filed with the SEC false and misleading; and (3) when defendants sold backdated

stock, they engaged in insider trading because they did so while in possession of material, non-public information (knowledge of the undisclosed backdating).

Plaintiff's backdating allegations are circumstantial.  They are based on statistical analysis.  Specifically, plaintiff claims that over thirty percent of Epiq's option grants were dated as of the lowest or second-lowest price of the calendar month in which they were granted, and that twenty percent were dated as of the lowest or second-lowest price of the quarter.  According to plaintiff, the odds of this occurring absent intentional manipulation are extremely remote.

Plaintiff employed a theory called "the Merrill Lynch methodology," which compares a theoretical annualized return based on the stock price movement in the twenty days following each grant date with the actual annual return following each grant date.  According to this methodology, if the 20-day returns are higher, there is "possible backdating" of "a few days or weeks."  Plaintiff's analysis of fifty separate grant dates—all of the grant dates between July 10, 1997 and January 3, 2006—showed that annualized 20-day returns were 193%, while actual annual returns were 49%.

Plaintiff also employed the methodology used by the Center for Financial Research and Analysis ("CFRA"), which identifies a significant risk of backdating whenever there are three or more option grants at or near a ten- or forty-day low in the company's stock price.  Specifically, the CFRA method identifies options that were granted at a price within 105% of the ten- or forty-day low price following the grant and where the price increased by more than ten percent during the forty days following the grant.

### III.  DISCUSSION

#### A.  Standing

Defendants first argue that plaintiff lacks standing to bring any claims accruing before July 31, 2001—the date that plaintiff first became an owner of Epiq stock.  Plaintiff's complaint details

events that happened well in advance of that date; ten of the seventeen stock option grants at issue

happened prior to July 31, 2001.

The Complaint states:

> To the extent plaintiff alleges facts that occurred prior to when it owned Epiq stock,
> such allegations are to demonstrate a pattern of backdating, repeated breaches of the
> duty of loyalty, ultra vires acts and violations of state and federal law, false
> statements, and the state of mind of defendants, among other things, in support of
> plaintiff's claims arising out of the false statements and transactions that occurred
> when it owned Epiq stock.

In other words, plaintiff specifically disclaims bringing claims for events happening prior to July 31,

2001.  Based on this representation, defendants' standing argument is moot.

In their reply brief, defendants take their argument one step further, and state, "Any such

allegations are not a legitimate subject of dispute, discovery, or proof at trial."  Because the case is

before the court on a motion to dismiss—not on a motion to limit discovery or evidence to be

presented at trial—the court does not reach these issues now.  But the court notes that defendants'

statement is contrary to some authority.  *See, e.g., In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d

986, 1010 (N.D. Cal. 2007) ("Even though plaintiff does not have standing to seek recovery for the

corporation for transactions that occurred before August 11, 2003, he may still refer to grants before

that date to establish that Zoran's management had a predisposition to engage in backdating."); *In re

Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (holding that

time-barred evidence is admissible to establish a scheme and scienter) (citing *United States v.

Ashdown*, 509 F.2d 793 (5th Cir. 1975) (mail fraud); *United States v. Blosser*, 440 F.2d 697, 699

(10th Cir. 1971) (same); *Fitzgerald v. Henderson*, 251 F.3d 345 (2d Cir. 2001) (Title VII)).  This

issue, however, is reserved for another day.

## B. Time Bars: Statutes of Repose and Limitations

Plaintiff filed its complaint on July 29, 2008.  Defendants argue that the applicable statutes of repose and limitations bar all but one of plaintiff's claims, the claim for the stock option grant dated January 3, 2006.  Plaintiff argues that the statutes of limitation were tolled because of defendants' fraudulent cover-up of their activities, and that the statutes of repose should be calculated from the date of the last misrepresentation because the case involves a continuous integrated scheme.

### 1.  Section 14(a) Claim

A plaintiff must bring claims under Section 14(a) of the Exchange Act within "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation."  *In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 2d 214, 220 (D. Mass. 2007).  Because "the purpose of the three-year limitation is clearly to serve as a cutoff, . . . tolling principles do not apply to that period."  *Lampf, Pleva, Lipkind, et al. v. Gilbertson*, 501 U.S. 350, 363 (1991).  "Shareholders may be expected to exercise reasonable diligence with respect to their shares, but this diligence does not require a shareholder to conduct complicated statistical analysis in order to uncover alleged malfeasance."  *Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007).

### a.  Statute of Repose

The court first addresses the statute of repose on plaintiff's Section 14(a) claims.  In *In re iBasis*, the court recognized that some courts have calculated the time for the statutes of repose from the date of the last fraudulent representation.  532 F. Supp. 2d at 220–21.  But as *In re iBasis* clarified, those cases involved "ongoing and continuing fraudulent schemes that relate[d] to the very core of each company's business."  532 F. Supp. 2d at 221 (citing *In re Stone & Webster, Inc. Sec. Litig.*, No. 00-10874-RWZ, 2006 WL 1738348, at *1 (D. Mass. June 23, 2006); *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897(HB), 2006 WL 314524, at *1 (S.D.N.Y. Feb. 10, 2006), *partially vacated on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,

531 F.3d 190 (2d Cir. 2008); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 332 (D. Mass. 2005)).  It

then noted that in more recent cases involving stock option grant date manipulation under Section

14(a), courts have held that the statute of repose begins on each claim when the violation occurs.  *Id.*

(citing *Stoll v. Ardizzone*, No. 07 Civ. 00608(CM), 2007 WL 2982250, at *2 (S.D.N.Y. Oct. 9,

2007); *In re Zoran*, 511 F. Supp. 2d at 1014 (N.D. Cal. 2007)).

 The court follows *In re iBasis* and the trend of cases holding that the statute of repose is

calculated from the date the alleged violation occurs.  This bars plaintiff's Section 14(a) claims

arising before July 29, 2005, leaving only the claim for the stock option grant dated January 3, 2006.

<h4 style="text-align:center">b.  Statute of Limitations</h4>

 Defendants argue that the January 3, 2006 claim is also barred by the one-year statute of

limitations.  According to defendants, plaintiff's complaint relies solely on public information that

was known or readily discoverable more than one year prior to the filing of this lawsuit.  Defendants

claim that plaintiff's method for allegedly uncovering the backdating scheme also shows that

plaintiff could have reasonably learned of its cause of action prior to filing its complaint.  According

to defendants, plaintiff filed its complaint on July 29, 2008, based on information that was available

as of April 26, 2007.  Plaintiff's claims are based on statistical analysis that could have been

conducted as soon as the information was available.  Finally, defendants argue that plaintiff's

argument is circular: it is improper to claim that the statute of limitations was tolled on a claim of

false proxy statements because the proxy statements were false.

 The court disagrees with defendants' analysis.  While plaintiff did, in fact, conduct

complicated statistical analysis to uncover defendants' alleged backdating, plaintiff was not required

to do so.  *See Ryan*, 918 A.2d at 360.  If plaintiff's allegations are taken as true, defendants engaged

in backdating over a significant period of time and took measures to hide their actions from

shareholders and the SEC.  The fact that this particular shareholder undertook the statistical analysis

to evaluate the odds that defendants were backdating does not nullify defendants' alleged acts of

concealment.  Based on the facts pleaded in the complaint, the court determines that the statute of

limitations was tolled on plaintiff's claims.  Shareholders "may rely on public filings and accept

them as true, and need not assume that directors and officers will falsify such filings."  *Id.* at 360.

### 2.  Section 10(b) and 29 Claims

Under Section 10(b) of the Exchange Act, a plaintiff must bring a claim for securities fraud

within "2 years after the discovery of the facts constituting the violation; or 5 years after such

violation."  28 U.S.C. § 1658(b).  The two-year limit is triggered "once the investor, in the exercise

of reasonable diligence, should have discovered the facts underlying the alleged fraud."  *Sterlin v.*

*Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998).  Claims under Section 29 of the Exchange Act

are subject to the same time limitations as claims under Section 10(b).  *In re Jupiter Networks, Inc.*

*Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008).  For the same reasoning set forth above,

applied to the statutes of repose and limitations for these claims, three instances of alleged

backdating survive the statutes of limitations and repose: December 9, 2003; February 14, 2005; and

January 3, 2006.

### 3.  State Law Claims

Defendants do not make any individual arguments on which state law claims are barred by

the statutes of repose and limitations, and why.  Rather, defendants lump plaintiff's state law claims

together, arguing that they "largely depend upon violations of the federal securities law to establish

injury to the corporation, and are thus properly limited to claims arising only from the backdating

alleged to have occurred as of January 3, 2006."

Plaintiff's state law claims are individual claims, and do not depend solely upon the viability

of federal claims.  At this time, the court will not dismiss any of plaintiff's state law claims as barred by the statutes of limitations.  This is not to say that none of them are time-barred.  But the court will not make defendants' arguments for them.

### C.  Failure to State a Claim - General Allegations

Defendants make a few arguments that all of plaintiff's allegations fail to state a claim generally.  Defendants argue that plaintiff "cherry-picked" dates when Epiq granted stock options during a period when the price was low and summarily concludes that defendants engaged in backdating.  They claim that plaintiff's methods are flawed and applied improperly to skew the results.

Plaintiff used a number of theories in conjunction with each other to identify stock options that meet backdating indicators: the Merrill Lynch methodology, the CFRA methodology, and theories that late reporting of stock option grants and failure to pre-plan the grants suggest backdating.  The court will examine the validity and reliability of each of the theories.

### 1.  "Cherry-Picking"

Generally, defendants attack the fact that plaintiff only shows what happened to stock prices on seventeen occasions.  Defendants contend that plaintiff does not allege the total number of stock option grants during the time period at issue in this case, and argue that even if there were fifty grants, statistical odds would suggest that the price would rise approximately one-half of the time that options were granted—or twenty-five times, not seventeen.  Defendants acknowledge that many of the option grants were on one of the dates with the lowest prices of the month.  But, defendants contend, using a calendar month for a comparison period skews the data.  Defendants urge the court to look instead to the weeks surrounding the options grants.  Using this measurement, defendants claim that only five out of fifty grants were issued on the lowest-price dates during the surrounding

weeks.

Defendants fail to acknowledge that plaintiff did allege that there were fifty stock option grants during the relevant time period.  And defendants oversimplify plaintiff's analysis.  Plaintiff did not merely suggest that backdating occurred any time that there was a rise in stock price following an option grant.  To the contrary, plaintiff used the theories examined below to identify grant dates that met a number of criteria.  Finally, plaintiff's use of calendar months for comparison purposes—an application that is objective and consistently applied—is reasonable, particularly at this stage of the litigation.

### 2.  *The Merrill Lynch Methodology*

Defendants cite four faults with the Merrill Lynch methodology: (1) the methodology only identifies a possibility of backdating, and a mere possibility is insufficient to state a claim; (2) there must have been thirty-three dates in which the stock price did not go up; (3) the returns used in the analysis are not actual returns, but annualized twenty-day increases in stock price that are misleading; and (4) courts have rejected the Merrill Lynch methodology.  The court now turns to each of these arguments.

First, plaintiff need not show that its methodology conclusively proves backdating.  Plaintiff alleges that over thirty percent of the options grants had suspicious timing.  This is sufficient to state a claim.

Second, it is unnecessary for plaintiff to allege that all options were backdated.  And defendants misstate the critera plaintiff used for identifying suspect transactions.  As noted above, plaintiff did not merely identify grant dates after which the stock price increased.  Rather, plaintiff used the subsequent stock prices in conjunction with other factors.

Third, the Merrill Lynch methodology may not be a perfect indicator of suspect option

grants.  If this case reaches trial, defendants may argue to the jury that annualized returns are misleading and do not reflect a proper comparison.  But they are enough to allow plaintiff to proceed with its case.

Finally, defendants are correct that some courts have criticized various plaintiffs' application of the Merrill Lynch methodology.  *See, e.g., In re Openwave Sys. S'holder Litig.*, 503 F. Supp. 2d 1341 (N.D. Cal. 2007); *In re PMC-Sierra, Inc. Deriv. Litig.*, No. C06-05330 RS, 2008 WL 2024888, at *2 (N.D. Cal. May 8, 2008).  But here, plaintiff has applied the methodology to all grants within a distinct time period, and has not modified the methodology.  This case is distinguishable from those cited by defendants.

For all of these reasons, the court determines that the Merrill Lynch methodology is a valid theory, particularly combined with the other theories used by plaintiff to identify suspect option grants.  This court follows a number of other courts that have accepted the theory as valid.  *See, e.g., Belova v. Sharp*, No. 07-299-MO, 2008 WL 700961, at *4–*5 (D. Ore. Mar. 13, 2008); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 957 (N.D. Cal. 2007); *Ryan*, 918 A.2d at 354–55; *Conrad v. Blank*, 940 A.2d 28, 39 n.30 (Del. Ch. 2007).

### 3.  The CFRA Methodology

Defendants criticize the CFRA methodology on the following bases: (1) the method does not use benchmarks for comparison to determine whether increases were unusual; (2) the method does not measure how its results compare to the company's stock-option grants as a whole; (3) only three suspect grants are required, disregarding any differences in the total number of grants dates; (4) the method does not produce a quantitative result—instead, it identifies a mere risk of backdating; and (5) other courts have rejected the CFRA methodology.

Again, defendants' attacks on the validity of the CFRA methodology do not convince the

court that it should disregard the findings as unreliable.  All of the faults identified by defendants are weaknesses that defendants may argue to a jury.  But they do not justify disregarding the findings of plaintiff's tests when evaluating the sufficiency of plaintiff's complaint.

### 4.  Plaintiff's Other Allegations

Defendants' final general arguments against plaintiff's claims are that (1) plaintiff has not supported its assertion that the odds that Epiq's option grant dates were selected "absent intentional manipulation" are "well over 1 in 1,000,000"; (2) plaintiff's statements that it could not find SEC filings for "a number of the alleged backdated option grants" and that several forms were filed "many months or over a year after the purported grant date" are insufficient to state a claim; and (3) plaintiff's assertion that stock options were not granted on a predetermined schedule adds nothing to the case.

Regardless of whether plaintiff's assertion about the "1 in 1,000,000" odds is accurate, the facts pleaded indicate to the court a sufficient probability that the grant dates were manipulated to survive a motion to dismiss.  The reporting lag time also supports an inference of backdating, *see Zoran*, 511 F. Supp. 2d at 1006 ("[A] late-filed Form 4 is a red flag."), as does the lack of a predetermined schedule, *see Ryan*, 918 A.2d at 355 ("The appearance of impropriety grows even more when one considers the fact that the board granted options, not at set or designated times, but by a sporadic method.").  While these inferences might not be sufficient individually to state a claim, in conjunction with the other testing that plaintiff conducted, they support plaintiff's claims.

### D.  Failure to State a Claim - Individual Claims

Defendants next argue that even if plaintiff's allegations survive the general attacks discussed above, each claim fails individually.

### 1.  Section 14(a)

To state a claim under Section 14(a), a plaintiff must allege: (1) that a proxy statement contained a material misrepresentation or omission; (2) the defendant's negligence; and (3) the existence of an essential link between the proxy and the alleged harm. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1151 (D. Kan. 2001). Defendants make two arguments why plaintiff's allegations fail to meet these requirements: (1) plaintiff fails to allege the "essential link"; and (2) plaintiff failed to plead facts giving rise to a strong inference of negligence.

### a.  "Essential Link"

To plead an "essential link," a plaintiff must allege that "the votes for a specific corporate transaction requiring shareholder authorization . . . are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which recovery is sought." *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) (quoting *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992)). Defendants argue that plaintiff does not allege that any options required shareholder approval or that any received shareholder approval as a result of the allegedly false proxy statements. Courts have held Section 14(a) claims to be insufficient where the only basis for alleging causation is an assertion that the injury would not have occurred absent the election of the Board pursuant to the proxy statement. *See Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008); *In re Affiliated Computer Servs. Deriv. Litig.*, 540 F. Supp. 2d 695, 704 (N.D. Tex. 2007); *In re Verisign*, 531 F. Supp. 2d at 1213.

Shareholder approval of Epiq's stock option plans was a necessary predicate to issuance of the allegedly backdated stock options. And shareholders conferred authority on the directors by approving those plans. The authority was subject to the requirements of the plans, which were attached to and repeated in Epiq's proxies. According to plaintiff, defendants violated those requirements but misrepresented to shareholders they were complying with option plans and dating

options as of the grant date, and otherwise omitted facts material to the proposals alleged.  The

allegedly backdated option grants could not have been accomplished without those plans or

authorized shares to issue, and the plans would not have been in place absent approval by Epiq's

shareholders.  Under these circumstances, courts find an "essential link."  *See, e.g., In re Zoran*, 511

F. Supp. 2d at 1015–16 (finding essential link where "[s]hareholders . . . authorized the stock-option

plans under which the allegedly-backdated options were granted"); *Belova*, 2008 WL 700961, at *7

(same); *see also Ryan*, 918 A.2d at 355; *Conrad*, 940 A.2d at 40.  Plaintiff has alleged an essential

link here.

### b.  Negligence

Defendants contend that plaintiff rests its case on inferences from quantitative statistics and

theories.  According to defendants, quantitative statistics and theories are insufficient to adequately

plead defendants' qualitative state of mind.  Defendants' argument is unpersuasive.  Plaintiff's

complaint alleges that each defendant who signed and approved proxies with false statements about

whether options were backdated also previously granted and/or received backdated options.  These

allegations are sufficient to supply a strong inference of negligence.  *See, e.g., Belova*, 2008 WL

700961, at *7; *In re Zoran*, 511 F. Supp. 2d at 1015–16.

### 2.  *Sections 10(b) and 29*

To state a valid claim under § 10(b), a plaintiff is required to allege:  "(1) a misleading

statement or omission of a material fact; (2) made in connection with the purchase or sale of

securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages."  *Grossman*, 120

F.3d at 1118; *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996) (citation

omitted).  Defendants claim that plaintiff's scienter and causation allegations are insufficient.

### a.  Scienter

-14-

With regard to scienter, the following is required:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).  To be "strong," an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504–05 (2007).

Here, taking plaintiff's allegations as true, plaintiff has sufficiently alleged scienter.  Both approving and receiving options that are not dated on the actual date that they are granted involves inherent elements of consciousness and intent:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated.  After all, any grant of options had to have been approved by the compensation committee, and that compensation committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.

*Ryan*, 918 A.2d at 355 n.35.  Plaintiff has made specific allegations against the individual defendants of their involvement in the option grants.  The complaint details their participation and responsibility on committees, their close involvement in internal controls, involvement in approval of financial statements and SEC filings, and violations of options plans, policies, and charters.  The complaint also suggests motive for individual defendants.  In this case, the inference of scienter as pleaded is "at least as compelling as any opposing inference."  *Tellabs*, 127 S. Ct. At 2510.

### b.  Loss Causation

"To establish loss causation, 'the plaintiff must demonstrate a causal connection between the

deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff.'" *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). In a derivative case, both exercised and unexercised options cause corporate loss.  In re *Zoran*, 522 F. Supp. 2d at 1011.  In *In re Zoran*, the court stated:

> [T]he corporation was defrauded by . . . its officers, who caused it to sell stock to its officers and directors for less than the corporation was entitled to receive for those shares, at least as to the options exercised.  As to unexercised options, Zoran was defrauded by . . . award[ing] options of more value to the recipient than authorized.

*Id.* at 1012.

Here, plaintiff alleges that defendants caused option grantees "to receive . . . option grants that improperly priced the common stock to be sold by the Company at prices lower than the fair market value as of the date of the grant and otherwise lower than what the option exercise price would have been had the option been dated properly."  (Compl. ¶ 238.)  Plaintiff alleges that Epiq suffered damages by its purchases of inflated stock and by "issuances of the Company's common stock."  (Compl. ¶ 240.)  The Complaint further alleges injury arising from unexercised options and the exercise of options.  These allegations are sufficient to survive defendants' motion to dismiss.

### 3.  *State Law Claims*

#### a.  Breach of Fiduciary Duty

Defendants miss the mark with their arguments that the court should dismiss plaintiff's claims for breach of fiduciary duty.  Defendants claim that plaintiff's allegations regarding this claim turn on whether defendants engaged in self-dealing.  This is too narrow a reading of plaintiff's complaint.  Plaintiff claims that defendants backdated options for themselves and others and concealed the backdating by making false and misleading statements and misrepresenting Epiq's financial records.  Plaintiff has stated a claim for breach of fiduciary duty.

### b.  Constructive Fraud

Defendants contend that the elements of the constructive fraud claim are duplicative of those for the breach of fiduciary duty claim.  The court agrees.  The Missouri Supreme Court has provided guidance on this issue:  "A breach of a fiduciary obligation is constructive fraud.  Constructive fraud is a long-recognized cause of action.  Missouri courts typically label these claims as breach of fiduciary duty."  *Klemme v. Best*, 941 S.W.2d 493, 495–96 (Mo. 1997) (multiple internal citations omitted).  The *Klemme* court then listed the elements for a claim, noting that they were the same whether the claim was labeled "constructive fraud" or "breach of fiduciary duty."  *Id.*  Based on *Klemme*, the court determines that Missouri treats constructive fraud and breach of fiduciary duty as one-and-the-same.  Plaintiff may not seek recovery for both claims.  Plaintiff's constructive fraud claim is dismissed.

### c.  Unjust Enrichment

The elements of an unjust enrichment claim in Missouri are: "conferral of a benefit on the defendant by the plaintiff; (2) defendant's appreciation of the fact of the benefit; and (3) defendant's acceptance and retention of the benefit in circumstances where retention is unjust."  *McCormick v. Cupp*, 106 S.W.3d 563, 568 (Mo. App. 2003) (citation omitted).  Defendants claim that to properly allege these elements, plaintiff must allege that "the value of each defendant's work for Epiq was, at a minimum, below the value of the salary, option grants, and other employee benefits he or she received."  The court rejects this position.  The facts that plaintiff alleges are sufficient to state a claim for unjust enrichment.  *See Ryan*, 918 A.2d at 361 (holding that an unjust enrichment claim was appropriate in the backdating context even where the defendant fails to exercise his stock options).

### d.  Abuse of Control, Gross Mismanagement, and Corporate Waste

-17-

This court has been unable to find Missouri precedent for recognizing causes of action for "abuse of control," "gross mismanagement," or "corporate waste." It appears to the court that any such cause of action, if Missouri were to recognize it, would be duplicative of other claims. *See In re Verisign*, 531 F. Supp. 2d at 1225 (suggesting that the plaintiff file an amended complaint, eliminating the corporate waste claim as duplicative of the unjust enrichment claim); *In re Zoran*, 511 F. Supp. 2d at 1019 (recognizing that claims for abuse of control and gross mismanagement were often considered a repackaging of claims for breach of fiduciary duty, but allowing corporate waste claim to proceed); *In re Abbott Labs. Deriv. Shareholder Litig.*, 126 F. Supp. 2d 535, 537 (N.D. Ill. 2000) (noting that a claim of corporate waste was duplicative of claim for breach of fiduciary duty). *But see In re Direct Gen. Corp. Sec. Litig.*, No. 3:05-0158, 2005 WL 1895638, at *2 (M.D. Tenn. Aug. 3, 2005) (allowing claims for breach of fiduciary duties, gross mismanagement, corporate waste, abuse of control, and unjust enrichment to proceed); *see also Anderson v. Thompson*, No. 1:07-CV-100, 2008 WL 820024, at *7 (E.D. Tenn. Mar. 25, 2008) (holding that Tennessee law provides some support for a claim of abuse of control and that it would be premature to determine whether the claim is identical to a claim for breach of fiduciary duty).

That said, the parties have devoted little attention to the viability of these claims. Defendants have simply stated that no Missouri precedent recognizes them. Plaintiff responds that other courts have recognized them. At this stage of the proceedings, the court will allow plaintiff to proceed with the claims. At a later date, defendants may choose to give the court more detailed arguments why the claims are invalid and duplicative, including an analysis of how the elements for the claims overlap. With additional briefing focusing on this issue, the court can determine whether to let the claims proceed further.

e.  Accounting and Rescission

Defendants ask the court to dismiss plaintiff's claims for accounting and rescission because they are equitable remedies that require an underlying violation of law.  Defendants are correct; these claims are not separate causes of action and do not independently justify relief.  But because the court holds that plaintiff states a claim for underlying violations of law, plaintiff may seek relief in the form of an accounting or rescission.  While technically these "claims" should be denoted as "remedies sought," the court does not believe that amendment of plaintiff's complaint is necessary to make this distinction.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 11) is denied in part and granted in part.  Plaintiff's constructive fraud claim is dismissed.  Plaintiff's claims are also limited by the applicable statutes of repose as explained in this order.

Dated this 3rd day of June 2009, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**